**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

*ex rel.* VERITY INVESTIGATIONS, LLC,

*Plaintiff/Relator*,

v.

NWN CORPORATION ;
UNITED MEDICAL SYSTEMS DE INC.;
MAKO STEEL, LP;
NEW STATE CAPITAL PARTNERS, LLC,

*Defendants.*

Case No. ___________

**ORIGINAL COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.***

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT PLACE IN PRESS BOX**

**Jury Trial Demanded**

# *QUI TAM* COMPLAINT

## I. INTRODUCTION

1. This is a *qui tam* case, filed on behalf of the federal government, seeking to recover over $13.5 million (plus mandatory trebling) that Defendants wrongfully obtained in the form of federal guaranteed loans by falsely certifying that they and their affiliates met the eligibility requirements for the Small Business Association's ("SBA's") Payment Protection Program ("PPP"). Those loans were later forgiven, and the federal government paid the bill.

2. The PPP was created by Congress near the start of the COVID-19 epidemic in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in 2020, and then received additional funding ($284 billion) In December 2020 in the "Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act."[1] 15 U.S.C. § 636(a)(37).

3. In early 2021, SBA authorized a second series of PPP loans, widely referred to as "Second Draw" PPP loans.

4. This case involves false applications for First Draw PPP loans.

5. For First Draw PPP loans, applicants were required to certify that they (both the applicant and its domestic and foreign affiliates) met the size standard—(a) collectively employed 500 or fewer persons, (b) met the SBA employee-based or revenue-based industry size standards, or (c) met the SBA alternative size standard that (i) the tangible net worth of the business is not more than $15 million and (ii) the average net income for two fiscal years before the date of the application is not more than $5 million.

[1] SBA INSPECTOR GENERAL INSPECTION REPORT, The Small Business Administration's Implementation of Recommended Controls and the Economic Aid Act (Aug. 12, 2021), https://www.sba.gov/sites/sbagov/files/2021-08/SBA%20OIG%20Report%2021-19.pdf.

6. Defendants falsely certified to the SBA that they met the size standards for a small business. As a direct result of those false statements, Defendants obtained First Draw PPP loans totaling $13,448,500, which were later forgiven.

7. Defendant New State Capital Partners, LLC—the private equity parent company who controls NWN Corporation, United Medical Services DE Inc., and Mako Steel, LP (collectively "Recipient Defendants") through a series of holding companies—caused or otherwise directed Recipient Defendants to apply for their First Draw PPP loans and make false statements to the SBA.

8. Relator is an outside investigative company that detected Defendants' fraud by reviewing the Defendants and Defendants' affiliate's annual reports and other sources of information. Those sources demonstrate that Defendants falsely certified to the SBA that they met the eligibility requirements for the PPP loans they obtained.

## II. The Parties

9. Plaintiff Verity Investigations LLC ("Relator") is an investigative firm formed by two professionals with widespread experience in detecting and reporting fraud on the U.S. public fisc.

10. Defendant New State Capital Partners, LLC is a Delaware limited liability company based in New Rochelle, New York.

11. Defendant NWN Corporation is a Delaware corporation with its principal place of business in Exeter, Rhode Island.

12. Defendant United Medical Systems DE Inc. is a Delaware corporation with its principal place of business in Westborough, Massachusetts.

13. Defendant Mako Steel, LP is a Delaware corporation with its principal place of business in Carlsbad, California.

## III. Jurisdiction and Venue

14. This action arises under the laws of the United States to redress violations of the Federal False Claims Act, 31 U.S.C. §§ 3729–33 ("FCA").

15. Subject-matter jurisdiction is conferred by 28 U.S.C. §§ 1331, 1345.

16. Venue is proper, and this Court has personal jurisdiction over Defendants, because one or more Defendants are "found" in this District. 31 U.S.C. § 3732(a).

## IV. The False Claims Act

17. The FCA is the primary civil remedial statute designed to deter fraud upon the United States. Its purpose is to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (July 28, 1986).

18. A defendant violates the FCA when the defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

19. Under the FCA, a claim includes a request for money. 31 U.S.C. § 3729(b)(2). A claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

20. In 2009, Congress amended the FCA through the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21 (May 20, 2009), making a defendant liable under the FCA when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

21. Under the FCA, the terms "knowing" and "knowingly" mean that the defendant "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

22. No proof of specific intent to defraud the Government is required to show that a defendant acted knowingly under the FCA. 31 U.S.C. § 3729(b)(1)(B).

23. The terms "knowing," "knowingly," "knowledge," "knows," and "knew," as used in this Complaint, have the meaning ascribed to them by the FCA.

24. The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

25. The FCA broadly defines a "claim" as "any request or demand . . . for money or property" that: "(i) is presented to an officer, employee, or agent of the United States," or "(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

26. The FCA imposes treble damages plus a civil penalty for each false claim. *See* 31 U.S.C. § 3729(a)(1).

27. The minimum and maximum civil penalty amounts are adjusted for inflation each successive year under the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat. 584, 599–601 (2015). *See* 28 C.F.R. § 85.5 (identifying applicable inflation adjustments on an annual basis); 31 U.S.C. § 3729(a)(1).

28. As of July 3, 2025, courts must assess a civil penalty of no less than $14,308 and no more than $28,619 per claim for FCA violations that occurred after November 2, 2015. *See* 28 C.F.R. § 85.5 Table 1.

29. False statements made in a loan application to a third-party lender qualify as "false claims" to the government where, as here, the loan is guaranteed by the federal government and the federal government later repays the lender. *See United States v. Van Oosterhout*, 96 F.3d 1491, 1494 (D.C. Cir. 1996).

## V. No "Public Disclosure" and Relator Is An Original Source

30. On information and belief, no "public disclosure" has been made of Defendants' false statements and fraud detailed herein. 31 U.S.C. § 3730(e)(4)(A).

31. On information and belief, Defendants' fraudulent transactions have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or by the news media.

32. Even if there had been a "public disclosure," that would not matter in this case because Relator is an "original source of the information" set forth in this complaint. 31 U.S.C. § 3730(e)(4)(A).

33. Relator's knowledge is independent of and materially adds to any publicly disclosed aspects of the fraudulent transactions described herein. Among other things, Relator has "connected the dots" between (a) Defendants' affiliate's annual reports and other sources of information, and (b) Defendants' false certifications for PPP loans.

34. Prior to filing this action, Relator voluntarily provided the Government with this complaint and all material evidence in Relator's possession relating to the fraudulent transactions.

## VI. The First Draw PPP Loan Program

35. To be eligible for a First Draw PPP loan, borrowers were required to meet one of the following criteria: "employs not more than the greater of (1) "500 employees;" or (2) "if applicable, the size standard in number of employees established by the Administration for the

industry in which the business concern, . . . operates," 15 U.S.C. § 636(a)(36)(D); or (3) meets the "alternative size standard" as of March 27, 2020 with (a) "maximum tangible net worth of the applicant is not more than $15,000,000"; and (b) "the average net income after Federal income taxes (excluding any carry-over losses) of the applicant for the 2 full fiscal years before the date of the application is not more than $5,000,000." 15 U.S.C. § 632(a)(5).

36. The SBA's website explained "who may qualify" for a First Draw PPP loan. This was explained in an overview page of the website[2] and in the online "Frequently Asked Questions" document available on the website.[3]

37. The SBA's FAQ stated that "borrowers" were "required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)."[4]

38. That regulation—13 C.F.R. § 121.301(f)—stated that when counting "employees," an applicant must include the employees of "all of its domestic and foreign affiliates." 13 C.F.R. § 121.301(f)(6).[5]

39. That regulation defined affiliation broadly:

i. Affiliation includes "affiliation based on ownership." "For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity. If no individual, concern, or entity is found to control, SBA will deem the Board of Directors or President or Chief Executive Officer (CEO) (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern. SBA will deem a minority shareholder

---

[2] SMALL BUSINESS ADMINISTRATION, First Draw PPP loan, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan.

[3] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders (as of April 6, 2020).

[4] SMALL BUSINESS and ADMINISTRATION, FAQ for PPP Borrowers and Lenders at 2 (as of April 6, 2020).

[5] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

to be in control, if that individual or entity has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders." *See* 13 C.F.R. § 121.301(f)(1).[6]

ii. Affiliation may also arise "under stock options, convertible securities, and agreements to merge." *See* 13 C.F.R. § 121.301(f)(2).[7]

iii. Affiliation may arise "based on management:" "Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls the Board of Directors or management of one or more other concerns. Affiliation also arises where a single individual, concern or entity controls the management of the applicant concern through a management agreement." *See* 13 C.F.R. § 121.301(f)(3).[8]

iv. Affiliation may arise "based on identity of interest:" "Affiliation arises when there is an identity of interest between close relatives, as defined in 13 CFR 120.10, with identical or substantially identical business or economic interests (such as where the close relatives operate concerns in the same or similar industry in the same geographic area). Where SBA determines that interests should be aggregated, an individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate." *See* 13 C.F.R. § 121.301(f)(4).[9]

v. Affiliation may arise "based on franchise and license agreements:" "The restraints imposed on a franchisee or licensee by its franchise or license agreement generally will not be

---

[6] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[7] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[8] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[9] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

considered in determining whether the franchisor or licensor is affiliated with an applicant franchisee or licensee provided the applicant franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership. SBA will only consider the franchise or license agreements of the applicant concern." *See* 13 C.F.R. § 121.301(f)(5).[10]

40. The SBA's FAQ also stated that applicants were required to apply "the affiliation rules" to the "employee-based or revenue-based size standard" and the "SBA's alternative size standard."[11]

41. The SBA required borrowers to submit a First Draw borrower application form (SBA Form 2483) to a federally insured bank or similar credit institution, which would process the loan application and fund the loan.

42. The SBA Form 2483 required the borrower to state its "Number of Employees."

43. The SBA Form 2483 then required the applicant's authorized representative to certify eligibility by signing a statement that "[t]he Applicant . . . employs no more than the greater of 500 or [*sic*] employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry."

44. The SBA Form 2483 then required the applicant's authorized representative to certify eligibility by signing a statement that "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)."

---

[10] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[11] SMALL BUSINESS and ADMINISTRATION, FAQ for PPP Borrowers and Lenders at 2 (as of April 6, 2020).

45. The SBA Form 2483 also required the applicant's authorized representative to initial to "certify that the information provided in this application . . . is true and accurate," and to acknowledge "that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000 . . . ."

46. The SBA guaranteed 100% of the outstanding balance of Defendant's First Draw PPP loan. The guarantee was backed by the full faith and credit of the United States. 15 U.S.C. § 636(a)(2)(F).

## VII. Defendants Falsely Certified to the SBA Their Compliance With the First Draw PPP Loan Size Requirements

### A. Background

#### 1. New State Capital Partners, LLC

47. Defendant New State Capital Partners, LLC, ("New State") is a private equity firm based in New Rochelle, New York.[12]

48. New State can be validly served with process via their registered agent at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.[13]

49. New State has made more than 40 acquisitions.[14] New State's approach emphasizes lead equity investments and buyouts.[15]

---

[12] New State Firm Overview, https://www.newstatecp.com/wp-content/uploads/2025/12/New-State-Overview_Winter-2025.pdf.

[13] Delaware, Division of Corporations, *New State Capital Partners LLC (File Number 4988910)*.

[14] New State Firm Overview, https://www.newstatecp.com/wp-content/uploads/2025/12/New-State-Overview_Winter-2025.pdf.

[15] New State's Website – Criteria, https://www.newstatecp.com/criteria/; Kentucky Retirement Systems - Special Called Board of Trustees Meeting Materials March 25 2021, https://web.archive.org/web/20210609081325/https://www.kyret.ky.gov/About/Meeting-Calendar/Materials/March%2025%202021%20Special%20Called%20Board%20of%20Trustees%20Meeting%20Materials.pdf.

50. New State started as an independent sponsor with a single limited partnership investment vehicle.[16] New State made three platform investments prior to raising its first institutional private equity fund.[17] New State now operates more than a dozen funds and holdings companies, including:[18]

i. NS Gautier Partners LP, formed in 2014;

ii. NS UMS Investment LLC, formed in 2015;

iii. NS CCC Partners LP, formed in 2015;

iv. New State Capital Partners Fund LP, formed in 2016;

v. New State Capital Partners Friend and Family Co-Investment Fund LP, formed in 2016;

vi. New State Capital Partners Fund II LP, formed in 2018;

vii. New State Capital Partners Friend and Family Co-Investment Fund II LP, formed in 2018;

viii. New State Capital Partners Fund II B LP, formed in 2019;

ix. New State Capital Partners Fund III LP, formed in 2022;

x. New State Capital Partners Fund III-A LP, formed in 2022;

xi. New State Capital Partners Fund III-B LP, formed in 2022;

xii. New State Capital Partners CSP Co-Invest Fund LP, formed in 2024;

xiii. NS UPS Investment LLC, formed in 2025;

---

[16] New State's Website – Partners – Independent Sponsors, https://www.newstatecp.com/partners/independent-sponsors/.

[17] Kentucky Retirement Systems, Board of Trustees Meeting Agenda – Investment Recommendation, https://web.archive.org/web/20210609081325/https://www.kyret.ky.gov/About/Meeting-Calendar/Materials/March%2025%202021%20Special%20Called%20Board%20of%20Trustees%20Meeting%20Materials.pdf.

[18] AUM 13f, *New State Capital Partners LLC*, https://aum13f.com/firm/new-state-capital-partners-llc?view_all=fund.

xiv. NS UPS A LLC, formed in 2025.

51. On information and belief, each of New State's limited partnership funds is set up with New State as General Partner and investors as Limited Partners, thereby establishing New State as the controlling party of each fund.[19] On information and belief, each of New State's limited liability holding companies is wholly-owned and/or controlled by New State.[20] Each Defendant at the time of the respective First Draw loan application was wholly- or majority-owned by one of New State's funds or holding companies. Therefore, New State, through its control relationship with their funds and holding companies, had a majority owned and/or controlling equity stake in each Defendant at the time of the respective First Draw loan application, qualifying New State as an "affiliate" for purposes of the PPP Loan program under one or more of the alternative definitions provided in 13 C.F.R. § 121.301(f).

52. In 2014, New State acquired United Medical Systems DE Inc ("UMS").[21] New State made five add-on acquisitions through UMS, including:[22]

i. Litho of America, acquired in February 2015;[23]

---

[19] New State Capital Partners Fund III, LP, Partnership Agreement, Kentucky State Retirement Systems, https://www.kyret.ky.gov/Investments/Investments-Library/Investment%20Manager%20Contracts/NSCP%20III.pdf; New State Capital Partners Fund, LP, Form D - Notice of Exempt Offering of Securities, SEC EDGAR, https://www.sec.gov/Archives/edgar/data/1644731/000164473115000001/xslFormDX01/primary_doc.xml; New State Capital Partners Friends & Family Co-Investment Fund II, LP, Form D – Notice of Exempt Offering of Securities, SEC EDGAR, https://www.sec.gov/Archives/edgar/data/1734553/000173455318000001/xslFormDX01/primary_doc.xml.
[20] New State Capital Partners Fund III, LP, Partnership Agreement, Kentucky State Retirement Systems, https://www.kyret.ky.gov/Investments/Investments-Library/Investment%20Manager%20Contracts/NSCP%20III.pdf
[21] UMS Press Release, *New State Capital Partners Acquires United Medical Systems, Inc.*, November 11, 2014, https://www.ums-usa.com/new-state-capital-partners-acquires-united-medical-systems-inc/; Lincoln International Press Release, United Medical Systems has been sold to New State Capital Partners, 2014, https://www.lincolninternational.com/transactions/united-medical-systems-has-been-sold-to-new-state-capital-partners/.
[22] New State's Website – About Us, https://www.newstatecp.com/home-2/about-us/.
[23] BioSpace, *United Medical Systems Acquires Litho Of America*, February 16, 2015, https://www.biospace.com/b-united-medical-systems-b-acquires-b-litho-of-america-b.

ii. US Lithotripsy, acquired from USMD Holding Inc. in December 2015;[24]

iii. American Kidney Stone Management, Ltd, acquired in May 2017.[25]

53. In 2015, New State acquired a majority stake in NWN Corporation ("NWN").[26] NWN was sold to American Securities LLC in 2024.[27]

54. In 2018, New State invested in Martinez Steel Corporation ("MSC") and replaced five of the company's officers, including the CEO.[28]

55. In 2019, New State acquired a majority stake in Mako Steel, Inc. ("MSI").[29] MSI merged into Mako Steel, LP, in 2023.[30]

56. In 2019, New State acquired a majority stake in Computer Data Source LLC ("CDS").[31]

57. In 2019, New State acquired Global Holdings Acquisition, LLC dba Global Client Solutions ("GHA").[32]

---

[24] UMS Press Release, *United Medical Systems Acquires USMD Holdings Inc.'s Lithotripsy Division*, December 28, 2015, https://www.ums-usa.com/united-medical-systems-acquires-usmd-holding-inc-s-lithotripsy-division/; Lincoln International Press Release, *United Medical Systems and New State Capital Partners have acquired US Lithotripsy from USMD Health System*, 2015, https://www.lincolninternational.com/transactions/united-medical-systems-and-new-state-capital-partners-acquired-us-lithotripsy-from-usmd-health-system/.

[25] USM Press Release, *United Medical Systems invests in AKSM, LTD*, May 9, 2017, https://www.ums-usa.com/united-medical-systems-invests-in-aksm-ltd/.

[26] Martinwolf Press Release, *New State Capital Partners Invests in NWN Corporation*, October 19, 2015, https://martinwolf.com/new-state-capital-partners-invests-in-nwn-corporation/.

[27] Morgan Lewis Press Release, *Morgan Lewis Advises New State Capital Partners in NWN Carousel Ownership Transition*, February 7, 2024, https://www.morganlewis.com/news/2024/02/morgan-lewis-advises-new-state-capital-partners-in-nwn-carousel-ownership-transition.

[28] New State's Website – Portfolio – Martinez Steel Corporation, https://www.newstatecp.com/portfolio/martinez-steel-corporation/.

[29] PRNewswire, *New State Capital Partners Acquires Majority Stake In Mako Steel*, August 6, 2019, https://www.prnewswire.com/news-releases/new-state-capital-partners-acquires-majority-stake-in-mako-steel-300896926.html.

[30] California, Division of Corporations, Mako Steel, Inc. (1868245) – Agreement and Plan of Merger (Doc No. D1680413).

[31] PRNewswire, New State Capital Partners Acquires Majority Stake In CDS, August 22, 2019, https://www.prnewswire.com/news-releases/new-state-capital-partners-acquires-majority-stake-in-cds-300905451.html.

[32] GlobalNewswire, Comvest Credit Partners Announces the Recapitalization of Global Holdings, October 15, 2019, https://www.globenewswire.com/news-release/2019/10/15/1929967/0/en/Comvest-Credit-Partners-Announces-the-Recapitalization-of-Global-Holdings.html.

58. On information and belief, Defendants NWN Corporation, United Medical Systems DE Inc, Mako Steel, LP, and their affiliates, as listed in ¶¶ 51-56, *supra*, qualify as "affiliates" for purposes of the PPP Loan program under one or more of the alternative definitions provided in 13 C.F.R. § 121.301(f).

59. On information and belief, New State caused Recipient Defendants to make false certifications to the SBA in connection with Recipient Defendants' First Draw PPP loan applications.

### 2. DEFENDANT NWN CORPORATION

60. Defendant NWN is a Delaware corporation with its principal place of business located at Exeter, Rhode Island.[33]

61. NWN can be validly served with process via its registered agent at 838 Walker Road Suite 21-2, Dover, DE 19904.[34]

62. NWN is a provider of IT support and cloud services.[35]

### 3. DEFENDANT UNITED MEDICAL SYSTEMS DE INC.

63. Defendant UMS is a Delaware corporation with its principal place of business located at Westborough, Massachusetts.[36]

64. UMS can be validly served with process via their registered agent at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.[37]

[33]Delaware, Division of Corporations, *NWN Corporation (File Number 3253762)*; NWN's Website – Locations, https://nwn.ai/locations/.
[34] Delaware, Division of Corporations, *NWN Corporation (File Number 3253762).*
[35] NWN's Website – About, https://nwn.ai/about/.
[36] Delaware, Division of Corporations, *United Medical Systems (DE), Inc. (File Number 3598716)*; UMS's Website – Contact, https://www.ums-usa.com/contact/..
[37] Delaware, Division of Corporations, *United Medical Systems (DE), Inc. (File Number 3598716).*

65. UMS provides specialized medical services to hospitals in the United States, Canada, Chile, and Ecuador.[38]

#### 4. Defendant Mako Steel, LP

66. Defendant Mako Steel, LP, ("MSLP") is a Delaware limited partnership with its principal place of business located at Carlsbad, California.[39]

67. MSLP is the Successor in Interest to Mako Steel, Inc., following the merger of MSI into MSLP.[40]

68. MSLP can be validly served with process via their registered agent at Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.[41]

69. MSLP is a manufacturer of steel building components and a construction company that specializes in steel buildings.

#### 5. New State Capital Partners, LLC and Its Affiliates

70. Recipient Defendants, along with the entities listed in ¶¶ 51-56, *supra*, were majority owned and/or controlled by New State at the time of Defendants' First Draw loan applications, which in turn means that Recipient Defendants and the listed entities were all "affiliates" of each other for the purposes of the PPP Loan program under one or more of the alternative definitions provided in C.F.R. § 121.301(f).

### B. NWN's False Statement to Obtain a First Draw PPP Loan

71. In 2020, NWN submitted a borrower application for a First Draw PPP loan.

---

[38] New State's Website – Portfolio – United Medical Systems, https://www.newstatecp.com/portfolio/united-medical-systems/.

[39] Delaware Division of Corporations, *Mako Steel LP (File Number 7510492)*; MSLP's Website – Contact Us West, https://makorabco.com/contact-us-west.

[40] California, Division of Corporations, Mako Steel, Inc. (1868245) – Agreement and Plan of Merger (Doc No. D1680413).

[41] Delaware Division of Corporations, *Mako Steel LP (File Number 7510492)*.

72. NWN submitted its borrower application, SBA Form 2483, to Legacy Bank at 101 W Main St, Hinton, OK 73047.

73. In its SBA Form 2483, NWN listed its address as 271 Waverly Oaks Road, Waltham, MA 02452.

74. In its SBA Form 2483, NWN certified that it and its affiliates met the small business size standard by having (1) no more than 500 employees, (2) meeting the SBA industry size standards, or (3) meeting the SBA alternative size standard.

75. In its SBA Form 2483, NWN represented that it and its affiliates had 407 employees—under the 500-employee limit needed to be eligible to apply.

76. NWN's certification in SBA Form 2483 that it met the size standards for a First Draw PPP loan was false. NWN and its affiliates had (1) far more than 500 employees in 2019 and 2020; (2) an employee count far exceeding the industry size standard; (3) a tangible net worth greater than $15 million in 2019 and 2020; and (4) an average net income for two fiscal years before the date of the application greater than $5 million.

77. NWN deliberately ignored the fact that, together with its affiliates, it did not meet the SBA size standards for obtaining a First Draw PPP loan. NWN signed its false SBA Form 2483 with knowledge of, or reckless disregard for, the truth.

78. On information and belief, New State caused NWN to falsely certify that NWN was eligible for the First Draw PPP loan NWN applied for. New State did so knowingly.

79. On or about April 27, 2020, NWN was approved for a First Draw PPP loan in the amount of $9,291,000 by lender Legacy Bank.

80. The U.S. government paid lender Legacy Bank, a lender's processing fee of 1% of the $9,291,000 loan, in the amount of $92,910.00.[42]

81. On or about June 25, 2021, the U.S. government forgave 100% of NWN's First Draw PPP loan, plus interest, in the amount of $9,398,362.67.

### C. UMS's False Statement to Obtain a First Draw PPP Loan

82. In 2020, UMS submitted a borrower application for a First Draw PPP loan.

83. UMS submitted its borrower application, SBA Form 2483, to Berkshire Bank at 99 North St, Pittsfield, MA, 01201.

84. In its SBA Form 2483, UMS listed its address as 1700 W Part Dr Suite 410, Westborough, MA 01581.

85. In its SBA Form 2483, UMS certified that it and its affiliates met the small business size standard by having (1) no more than 500 employees, (2) meeting the SBA industry size standards, or (3) meetings the SBA alternative size standard.

86. In its SBA Form 2483, UMS represented that it and its affiliates had 191 employees—under the 500-employee limit needed to be eligible to apply.

87. UMS's certification in SBA Form 2483 that it met the size standards for a First Draw PPP loan was false. UMS and its affiliates had (1) far more than 500 employees in 2019 and 2020; (2) an employee count far exceeding the industry size standard; (3) a tangible net worth greater than $15 million in 2019 and 2020; and (4) an average net income for two fiscal years before the date of the application greater than $5 million.

---

[42] Paycheck Protection Program (PPP) Information Sheet: Lenders, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

88. UMS deliberately ignored the fact that, together with its affiliates, it did not meet the SBA size standards for obtaining a First Draw PPP loan. UMS signed its false SBA Form 2483 with knowledge of, or reckless disregard for, the truth.

89. On information and belief, New State caused UMS to falsely certify that UMS was eligible for the First Draw PPP loan UMS applied for. New State did so knowingly.

90. On or about April 28, 2020, UMS was approved for a First Draw PPP loan in the amount of $3,616,900 by lender Berkshire Bank.

91. The U.S. government paid lender Berkshire Bank a lender's processing fee of 1% of the $3,616,900 loan, in the amount of $36,169.00.[43]

92. On or about June 9, 2021, the U.S. government forgave 100% of UMS's First Draw PPP loan, plus interest, in the amount of $3,655,447.24.

### D. MSI's False Statements to Obtain a First Draw PPP Loan

93. In 2020, MSI submitted a borrower application for a First Draw PPP loan.

94. MSI submitted its borrower application, SBA Form 2483, to Banc of California at 11611 San Vincente Blvd, Ste 500, Los Angeles, CA 90049.

95. In its SBA Form 2483, MSI listed its address as 5650 El Camino Real Suite 100, Carlsbad, CA 92008.

96. In its SBA Form 2483, MSI certified that it and its affiliates met the small business size standard by having (1) no more than 500 employees, (2) meeting the SBA industry size standards, or (3) meeting the SBA alternative size standard.

97. In its SBA Form 2483, MSI represented that it and its affiliates had 35 employees -- under the 500-employee limit needed to be eligible to apply.

---

[43] Paycheck Protection Program (PPP) Information Sheet: Lenders, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

98. MSI's certification in SBA Form 2483 that it met the size standards for a First Draw PPP loan was false. MSI and its affiliates had (1) far more than 500 employees in 2019 and 2020; (2) an employee count far exceeding the industry size standard; (3) a tangible net worth greater than $15 million in 2019 and 2020; and (4) an average net income for two fiscal years before the date of the application greater than $5 million.

99. MSI deliberately ignored the fact that, together with its affiliates, it did not meet the SBA size standards for obtaining a First Draw PPP loan. MSI signed its false SBA Form 2483 with knowledge of, or reckless disregard for, the truth.

100. On information and belief, New State caused MSI to falsely certify that MSI was eligible for the First Draw PPP loan MSI applied for. New State did so knowingly.

101. On or about April 14, 2020, MSI was approved for a First Draw PPP loan in the amount of $540,600 by lender Banc of California.

102. The U.S. government paid lender Banc of California a lender's processing fee of 3% of the $540,600 loan, in the amount of $16,218.00.[44]

103. On or about November 25, 2020, the U.S. government forgave 100% of MSI's First Draw PPP loan, plus interest, in the amount of $543,828.79.

### E. Evidence of Number of Employees

104. In its SBA Forms 2483 and 2483-SD, a company must include "the employees of its domestic and foreign affiliates" in calculating its number of employees. *See* 13 C.F.R. § 121.106(b)(1).

105. Defendants' affiliate, MSC, received a First Draw PPP loan in the amount of $3,268,090. In its SBA Form 2483, MSC reported 205 employees.

---

[44] Paycheck Protection Program (PPP) Information Sheet: Lenders, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

106. In their SBA Forms 2483, Recipient Defendants collectively reported 838 employees, well over the 500-employee limit needed to be eligible to apply:

| Entity | First Draw PPP Loan Number of Employees |
|---|---|
| NWN | 407 |
| UMS | 191 |
| MSI | 35 |
| MSC | 205 |
| **Total** | **838** |

107. Relator analyzed the 2019 and 2020 Form 5500 annual reports for employee benefit plans sponsored by Defendants and their affiliates. The filings identify the number of "active participants" in each welfare or retirement plan at the beginning and end of each plan year.

108. "Active participants" in these Form 5500 filings are employees of the sponsor employer who are covered by, or eligible to participate in, the plan. Accordingly, the active-participant counts reported for each entity are a conservative proxy for the entity's U.S. employee headcount in the relevant year.

109. Based on 2019 and 2020 Form 5500 annual reports of Defendants and their affiliates, it is estimated that Defendants' corporate group collectively had a *minimum* of 993-1,057 domestic employees in 2019 and a *minimum* of 996 domestic employees at the start of 2020, shown as follows:

| Entity | Plan Type | Start of 2019 APs | End of 2019 APs | Start of 2020 APs |
|---|---|---|---|---|
| NWN | Retirement Plan | 497 | 407 | 411 |
| UMS | 401(k) Plan | 241 | 208 | 208 |
| MSI | 401(k) Plan | 18 | 23 | 18 |
| MSC | 401(k) Plan | 86 | 87 | 91 |
| CDS | 401(k) Plan | 80 | 77 | 77 |
| GHA | 401(k) Plan | 135 | 156 | 156 |
| **Total** | | **1,057** | **993** | **996** |

110. If Recipient Defendants had counted their affiliates' U.S. employees in their First Draw PPP loan applications, they would have reported far more than the 500-employee limit in its application.

111. On information and belief, Defendants' and their affiliates' payroll records from 2019 and 2020 will confirm what Defendants always knew—that they and their affiliates collectively employed well over 500 employees throughout the time period 2019–2020.

### F. Evidence of Ineligibility under the Industry Size Standard

112. Defendant NWN did not qualify as a small business under the employee-based SBA industry size standard applicable to them.

113. For the purposes of their First Draw PPP loan, NWN was classified under NAICS code 423430, which covers the industry for Computer and Computer Peripheral Equipment and Software Merchant Wholesalers. The SBA industry size standard for NAICS code 423430 is 250 employees. *See* 13 C.F.R. § 121.201 (effective Nov. 20, 2019 to May 1, 2022).

114. As discussed in ¶¶ 104-108, *supra*, Defendants collectively reported 838 employees on their applications for First Draw PPP loans and the Form 5500 annual reports of Defendants and their affiliates indicate that Defendants' corporate group collectively had *at least* 993 employees in FY 2019 and 996 employees in FY 2020, easily surpassing the applicable industry size standard for NWN.

115. Given the above, Defendant NWN did not qualify as a small business under the applicable employee-based industry size standard.

116. Defendant UMS and Defendant MSLP's Predecessor in Interest, MSI, also did not qualify as small businesses under the revenue-based SBA industry size standards applicable to it.

117. For the purposes of its First Draw PPP loan, UMS was classified under NAICS code 621999, which covers the industry for All Other Miscellaneous Ambulatory Health Care

Services. The SBA industry size standard for NAICS code 621999 is $16.5 million of revenues. *See* 13 C.F.R. § 121.201 (effective Nov. 20, 2019 to May 1, 2022).

118. For the purposes of its First Draw PPP loan, MSI was classified under NAICS code 236210, which covers the industry for Industrial Building Construction. The SBA industry size standard for NAICS code 236210 is $39.5 million of revenues. *See* 13 C.F.R. § 121.201 (effective Nov. 20, 2019 to May 1, 2022).

119. Defendant NWN was approved for a $9.29 million First Draw PPP loan. By rule, PPP amount is approximately 2.5× average monthly payroll. This equates to approximately $3.72 million of monthly payroll and annual payroll of $44.60 million.

120. For businesses under NAICS code 423430, payroll is estimated to run approximately 7-10% of revenue.[45] This implies that NWN is estimated to have generated between $445.97-637.10 million of revenue.

121. Defendant UMS was approved for a $3.62 million First Draw PPP loan. By rule, PPP amount is approximately 2.5× average monthly payroll. This equates to approximately $1.45 million of monthly payroll and annual payroll of $17.36 million.

122. For businesses under NAICS code 621999, payroll is estimated to run approximately 25-35% of revenue.[46] This implies that UMS is estimated to have generated between $49.60-69.44 million of revenue.

123. Defendant MSLP's Predecessor in Interest, MSI, was approved for a $541,000 First Draw PPP loan. By rule, PPP amount is approximately 2.5× average monthly payroll. This equates to approximately $216,000 of monthly payroll and annual payroll of $2.60 million.

---

[45] SICCode.com – NAICS Code 423430, https://siccode.com/naics-code/423430/computer-computer-peripheral-equipment-software-merchant-wholesalers.

[46] SICCode.com – NAICS Code 621999, https://siccode.com/naics-code/621999/ambulatory-health-care-services.

124. For businesses under NAICS code 331221, payroll is estimated to run approximately 15-20% of revenue.[47] This implies that MSI is estimated to have generated between $12.97-17.30 million of revenue.

125. Defendants' affiliate, MSC, was approved for a $3.27 million First Draw PPP loan. By rule, PPP amount is approximately 2.5× average monthly payroll. This equates to approximately $1.31 million of monthly payroll and annual payroll of $15.69 million.

126. For businesses under NAICS code 236210, payroll is estimated to run approximately 5-15% of revenue.[48] This implies that MSC is estimated to have generated between $104.58-313.74 million of revenue.

127. Third-party sources estimate that Defendants' affiliate, CDS, generates between $39.7-63.5 million of revenue.[49]

128. Third-party sources estimate that Defendant's affiliate, GHA, generates between $46.0-93.8 million of revenue.[50]

129. This implies that before or at the start of the COVID-19 pandemic, Defendants and their affiliates collectively **generated at least $581.3-863.8 million of yearly revenue.**

130. Given the above, Defendants UMS and MSI did not qualify as small a business under the applicable revenue-based industry size standard.

### G. EVIDENCE OF TANGIBLE NET WORTH & AVERAGE NET INCOME GREATER THAN THE ALTERNATIVE SIZE STANDARD

131. The SBA's alternative size standard required applicants to show that they and their affiliates had both (i) tangible net worth of not more than $15 million, and (ii) average net income

[47] SICCode.com – NAICS Code 236210, https://siccode.com/naics-code/236210/industrial-building-construction.
[48] SICCode.com – NAICS Code 331221, https://siccode.com/naics-code/331221/rolled-steel-shape-manufacturing.
[49] ZoomInfo, Computer Data Source, https://www.zoominfo.com/c/computer-data-source-inc/16271854; Growjo, Computer Data Source, https://growjo.com/company/Computer_Data_Source.
[50] ZoomInfo, Global Client Solutions, https://www.zoominfo.com/c/global-client-solutions-llc/35721105; RocketReach, Global Holdings LLC, https://rocketreach.co/global-holdings-llc-profile_b4068658fc2328e7.

of less than $5 million for the two fiscal years before the date of Defendants' 2020 application for a First Draw PPP loan.

132. Net income estimations confirm that Defendants' 2018-2019 average net income was well above $5 million. On December 31, 2019, the NYU Stern School of Business published *Margins by Sector (US)*, which estimated gross income margins by industry using 2019 data.[51] On December 24, 2020, the NYU Stern School of Business published *Margins by Sector (US)*, which estimated gross income margins by industry using 2020 data.[52]

133. Defendant NWN fits within the Computer Services industry, which had a net margin of 4.03% and 4.34% in FY 2018 and FY 2019, respectively.

134. Given these average margins, NWN is estimated to have generated between $17.79-25.68 million of net income in FY 2018 and between $19.36-27.65 million of net income in FY 2019.

135. Defendant UMS fits within the Healthcare Support Services industry, which had a net margin of 2.46% and 1.78% in FY 2018 and FY 2019, respectively.

136. Given these average margins, UMS is estimated to have generated between $1.22-1.71 million of net income in FY 2018 and between $883 thousand - $1.24 million of net income in FY 2019.

137. Defendant MSLP's Predecessor in Interest, MSI, fit within the Engineering/Construction industry, which had a net margin of 2.18% and 1.00% in FY 2018 and FY 2019, respectively.

[51] NYU Stern, Margins by Sector (US), via Internet Archive, December 31, 2019, https://web.archive.org/web/20191231161223/https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html.

[52] NYU Stern, Margins by Sector (US), via Internet Archive, December 24, 2020, https://web.archive.org/web/20201224005255/https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html.

138. Given these average margins, MSI is estimated to have generated between $282-377 thousand of net income in FY 2018 and between $130-173 thousand of net income in FY 2019.

139. Defendants' affiliate, MSC, fits within the Steel industry, which had a net margin of 7.32% and 5.98% in FY 2018 and FY 2019, respectively.

140. Given these average margins, MSC is estimated to have generated between $7.66-22.97 million of net income in FY 2018 and between $6.25-18.76 million of net income in FY 2019.

141. Defendants' affiliate, CDS, fits within the Computer Services industry, which had a net margin of 4.03% and 4.34% in FY 2018 and FY 2019, respectively.

142. Given these average margins, CDS is estimated to have generated between $1.60-2.56 million of net income in FY 2018 and between $1.72-2.76 million of net income in FY 2019.

143. Defendants' affiliate, GHA, fits within the Financial Services (Non-bank & Insurance) industry, which had a net margin of 20.06% and 26.94% in FY 2018 and FY 2019, respectively.

144. Given these average margins, GHA is estimated to have generated between $9.23-18.82 million of net income in FY 2018 and between $12.39-25.27 million of net income in FY 2019.

145. Given the average margins, in FY 2018, Defendants and their affiliates are estimated to have collectively generated between $37.96-72.10 million of net income, as calculated in ¶¶ 132-143, *supra*.

146. Given the average margins, in FY 2019, Defendants and their affiliates are estimated to have collectively generated between $40.74-75.85 million of net income, as calculated in ¶¶ 132-143, *supra*.

147. This implies that Defendants and their affiliates collectively generated an average **of $39.35-73.97 million of net income** between FY 2018 and FY 2019. This figure is far above the $5 million dollar threshold.

148. Given this average net income, Defendants could not have qualified for a First Draw PPP loan under the SBA's alternative size test.

### H. Evidence of Lack of Economic Need for PPP Loans

149. Each Recipient Defendant certified in their respective SBA Form 2483-SD that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."[53]

150. The SBA's FAQ document stated that "[b]orrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business."[54]

151. Recipient Defendants' parent, New State, had significant sources of liquidity at the time of Recipients Defendants' First Draw loan applications.

---

[53] TAB-0000162.

[54] Small Business Administration, FAQ for PPP Borrowers and Lenders at 11 (as of April 23, 2020), https://www.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_04%2023%2020.pdf.

152. As of December 31, 2020, New State had over $480 million under management.[55] New State continued making acquisitions and executing transactions throughout 2020.[56]

153. The liquidity of Defendants' parent gives the lie to Defendants' false statements that the PPP loans were necessary to support their operations.

**FIRST CAUSE OF ACTION**

**Submitting False Claims for Payment**
**31 U.S.C. § 3729(a)(1)(A)**

154. Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

155. Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and/or causing to be presented to the lenders claims for approval of one or more PPP loans.

156. Defendants' knowingly false claims on their respective SBA Form 2483 was material to the lenders' decisions to issue the loans and was material to the SBA's decision to forgive the loans and repay the lender.

157. But for these knowingly false claims, the lender would not have issued the loans, and the SBA would not have forgiven them.

158. The PPP loans obtained was money that was intended by the Government to be spent or used to advance the Government's program and interest in assisting qualified and eligible small businesses to survive the COVID-19 epidemic and to continue to employ their workers.

---

[55] Kentucky Retirement Systems - Special Called Board of Trustees Meeting Materials March 25 2021, https://web.archive.org/web/20210609081325/https://www.kyret.ky.gov/About/Meeting-Calendar/Materials/March%2025%202021%20Special%20Called%20Board%20of%20Trustees%20Meeting%20Materials.pdf.

[56] Id.; PR Newswire, *New State Capital Takes Stake in Klein Hersh, The Leading Executive Search Firm To The Life Sciences/Healthcare Industry*, November 17, 2020, https://www.prnewswire.com/news-releases/new-state-capital-takes-stake-in-klein-hersh-the-leading-executive-search-firm-to-the-life-scienceshealthcare-industry-301174411.html; PR Newswire, *New State Capital Takes Majority Stake In KMS*, December 2, 2020, https://www.prnewswire.com/news-releases/new-state-capital-takes-majority-stake-in-kms-301183459.html.

159. The PPP loans obtained was money that the Government effectively and in practice provided to the lender, by means of the Government's 100% guarantee to the lender of repayment by the Government in the case of default by the borrower.

160. The Government later reimbursed the lender 100% of the amount of each PPP loan obtained, with interest.

## SECOND CAUSE OF ACTION

### Creating a False Record or Statement Material to a False Claim
### 31 U.S.C. § 3729(a)(1)(B)

161. Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

162. Defendants violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making or causing to be made a false record and statement—namely, their SBA Form 2483 and its included certifications—to support a false claim submitted to the lender for approval of First Draw PPP loans.

163. Defendants' knowingly false records and statements were material to the lenders' decisions to issue the loans and were material to the SBA's decisions to forgive the loans and repay the lender.

164. But for Defendants' knowingly false record and statement, the lenders would not have issued the loans, and the SBA would not have forgiven them.

## THIRD CAUSE OF ACTION

### Improperly Avoiding an Obligation to Pay or Transmit Money
### 31 U.S.C. § 3729(a)(1)(G)

165. Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

166. Defendants violated 31 U.S.C. § 3729(a)(1)(G) by knowingly and improperly avoiding their obligations to pay or transmit money to the SBA—namely, the money they received from the SBA in forgiveness for their PPP loans.

167. Defendants knew they improperly received money from the SBA when the SBA forgave their PPP loans.

168. Defendants had an obligation to pay back the SBA the full amount they received in forgiveness of the PPP loans.

169. Defendants knew of their obligation to pay back the SBA.

170. Defendants improperly avoided their obligation to pay back the SBA.

## FOURTH CAUSE OF ACTION
## Conspiring to Commit Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(A), (B), (G))
## 31 U.S.C. § 3729(a)(1)(C)

171. Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

172. At all relevant times, Defendant New State exercised control over Recipient Defendants, including through holding controlling equity in Recipients Defendants and/or through an asset management agreement.

173. On information and belief, Defendant New State caused Recipient Defendants to submit their fraudulent applications for a First Draw PPP loan and First Draw PPP loan forgiveness.

174. Defendant New State had actual knowledge of the truth, or at minimum acted with deliberate indifferent or reckless disregard for the truth—that Recipient Defendants were not eligible for the First Draw PPP loans they obtained and received forgiveness of.

175. Defendant New State and Recipients Defendants entered into an agreement, express or implied, to submit false claims and to conceal noncompliance with the First Draw PPP loan eligibility requirements from the Government, constituting a conspiracy in violation of 31 U.S.C. § 3729(a)(1)(C).

176. Recipient Defendants' false claims, directed by Defendant New State, were material to the lenders' decisions to issue the loans and were material to the SBA's decisions to forgive the loans and repay the lender.

177. As a direct and proximate result of Defendants' conspiracy, the United States paid claims it would not have paid had it known the truth—that Recipient Defendants were ineligible for the First Draw PPP loans they applied for and received.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator requests judgment against Defendants for: (i) three times the amount of damages that the United States has sustained (including the full amount of the forgiven PPP loans and interest thereon, plus all processing fees paid by the Government); (ii) the maximum civil penalties allowed by law; (iii) an award to Relator for the maximum allowed under 31 U.S.C. § 3730(d); (iv) an award of attorney's fees, costs, and expenses; (v) interest as provided by law; and (vi) any other relief that this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Date: March 30, 2026

Respectfully submitted,

Steven M. Shepard
Stephen Shackelford, Jr.

**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshepard@susmangodfrey.com
sshackelford@susmangodfrey.com

*Attorneys for Relator Verity Investigations, LLC*